**Venessa McDANIELS, Plaintiff,**

**v.**

**GROUP HEALTH COOPERATIVE, Defendant.**

**Case No. C13–1689JLR.**

United States District Court,
W.D. Washington,
at Seattle.

Signed Oct. 29, 2014.

Harold Hudson Franklin, Jr., Renton, WA, for Plaintiff.

Sheehan H. Sullivan Weiss, Paula C. Simon, Portia R. Moore, Davis Wright Tremaine, Seattle, WA, for Defendant.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

JAMES L. ROBART, District Judge.

This matter comes before the court on Defendant Group Health Cooperative's

("Group Health") motion for summary judgment on all claims. (Mot. (Dkt. # 13).) Plaintiff Venessa McDaniels brings this action against Group Health, her former employer, alleging a variety of claims, including race, age, and disability discrimination; interference with her rights under the Family and Medical Leave Act ("FMLA"); breach of contract; negligent supervision; and wrongful discharge. (*See generally* Ver. of State Court Rec. (Dkt. # 2) Ex. A ("Compl. ").) Having reviewed the record, the applicable law, and the submissions of the parties, and being fully advised, the court finds there are no genuine disputes of material fact and that Group Health is entitled to judgment as a matter of law. As such, the court grants Group Health's motion and enters summary judgment in favor of Group Health on all of Ms. McDaniels' claims.

## I. BACKGROUND

Group Health is a non-profit healthcare system headquartered in Seattle, Washington. (Wood Decl. (Dkt. # 14) ¶ 3; Compl. ¶¶ 3, 5.) Ms. McDaniels, who is African-American, began working for Group Health in January 2010 at Group Health's Capitol Hill campus. (Wood Decl. ¶¶ 3, 4; Compl. ¶¶ 4, 8.) In October or November 2011, Ms. McDaniels transferred to the OB/GYN and Urology Unit at the Capitol Hill campus ("the Unit"), where she worked as a Patient Access Representative ("PAR"). (Wood Decl. ¶ 4; Simon Decl. (Dkt. # 14) ¶ 2, Ex. 1 ("McDaniels Dep.") at 59:12–14.) Group Health terminated Ms. McDaniels' employment on October 19, 2012. (Wood Decl. ¶ 27, Ex M.)

As a PAR, Ms. McDaniels worked in the front area of the Unit and was responsible for performing a variety of administrative tasks, many of which involved interacting with patients both in-person and over the phone. (*Id.* ¶ 6, Ex. D; McDaniels Dep. at 87:11–88:21.) Like the other PARs in the Unit, Ms. McDaniels worked each shift at one of six stations and rotated daily. (Wood Decl. ¶ 7; McDaniels Dep. at 88:22–90:16.) Each station contains a desk, a computer, a keyboard, and a chair. (Wood Decl. ¶ 7; McDaniels Dep. at 90:17–22.) Three of the stations are patient-facing, while three sit behind a thin five-foot wall. (Wood Decl. ¶ 7; McDaniels Dep. at 88:22–89:5.) As of late January 2012, Ms. McDaniels' supervisor in her position as a PAR was Corrine Wood. (Wood Decl. ¶¶ 2, 4; McDaniels Dep. at 60:5–9.)

### A. Health Issues

During 2012, Ms. McDaniels experienced several health-related issues that impacted her work. In late February 2012, she submitted to Ms. Wood a letter from her primary care physician. (Wood Decl. ¶ 28, Ex. R.) The letter expressed a concern that Ms. McDaniels' desk was too low and requested that Group Health perform an ergonomic assessment of her workstation. (*Id.;* McDaniels Dep. at 193:20–194:5.) Within two days of the date of that letter, Ms. McDaniels received an email from Vicki Pasko, an Administrative Specialist for Group Health, asking Ms. McDaniels to fill out a self-assessment to prepare for a formal worksite assessment. (Wood Decl. ¶ 28, Ex. S; McDaniels Dep. at 194:19–195:4.)

On March 19, Michael Hansen, a physical therapist at Group Health, conducted a formal ergonomic worksite assessment for Ms. McDaniels. (Hansen Decl. (Dkt. # 16) ¶ 5, Ex. 1; Wood Decl. ¶ 29.) Mr. Hansen recommended resolving Ms. McDaniels' issues with her workstation by moving her keyboard from the keyboard tray to the top of the desk and then raising her chair. (Hansen Decl. ¶¶ 5–6, Ex. 1; McDaniels Dep. at 196:17–197:4.) He did not identify

any other ergonomic deficiencies. (Hansen Decl. ¶¶ 5–8, Ex. 1; McDaniels Dep. at 197:5–8.) In addition, Group Health permitted Ms. McDaniels to designate one chair in the PAR work area as her own. (Wood Decl. ¶ 29; *see also* Resp. (Dkt. # 20) at 3.)

In April 2012, Ms. McDaniels reported problems with arthritis in her knee and sought intermittent leave under the FMLA to deal with that condition. (McDaniels Dep. at 268:17–269:11.) Group Health granted her request, designating this leave as # 1120211 in its system. (*Id.;* Wood Decl. ¶ 30, Ex. T.) From March through October of 2012, Ms. McDaniels took approximately 118 hours of approved FMLA leave under leave # 1120211. (Wood Decl. ¶ 30, Ex. T.)

In June 2012, Ms. McDaniels fell at work when she attempted to sit down but missed her chair. (Wood Decl. ¶ 31; McDaniels Dep. at 201:19–202:2.) She claims that this incident caused sciatica, a condition that involves pain along the sciatic nerve in the hip and thigh. (McDaniels Dep. at 205:13–21; Webster's New World Dictionary 1202, "sciatica" (3d ed. 1988).) On June 28, Physician Assistant ("PA") Jonathan Green evaluated Ms. McDaniels. (Wood Decl. ¶ 32; Simon Decl. ¶ 4, Ex. 3 ("Green Dep.") at 16:5–17.) In light of that evaluation, PA Green recommended that for two weeks Ms. McDaniels take a five-minute walking break every hour. (McDaniels Dep. at 210:2–10; Green Dep. at 18:9–24; Wood Decl. ¶ 32, Ex. U.) Group Health allowed Ms. McDaniels to take these walking breaks through August 20, 2012. (Wood Decl. ¶ 33, Ex. W; Green Dep. at 31:15–25.) PA Green also estimated that Ms. McDaniels might experience flareups in pain once every two weeks that would require her to miss a day of work. (Wood Decl. ¶ 35, Ex. Y.)

In connection with her alleged sciatica, Ms. McDaniels requested intermittent FMLA leave, which Group Health allowed under leave # 1179780, as well as workers compensation. (*Id.;* McDaniels Dep. at 274:18–21, 276:17–277:8; Adelfio Decl. (Dkt. # 17) ¶ 4.) Group Health approved the majority of Ms. McDaniels' leave requests under leave # 1179780 for a total of 103.75 hours of approved FMLA leave from August through October 2012. (Wood Decl. ¶¶ 36–37, Ex. Y; Simon Decl. ¶ 10 (table of leave hours and dates).)

On several occasions, however, Group Health did not give Ms. McDaniels the leave she requested. At least twice, Ms. McDaniels requested FMLA leave to go to massage or other medical appointments during working hours, but Group Health told her to reschedule because the Unit was already going to be short-staffed at that time. (McDaniels Decl. (Dkt. # 20–1) Ex. H.) In addition, on two occasions, Ms. McDaniels took time off work that she labeled as FMLA leave but which Matrix, Group Health's outside leave administrator, later designated as unexcused absences. (Wood Decl. ¶ 37, Ex. Y; McDaniels Dep. at 277:13–280:20.) Group Health did not punish Ms. McDaniels for either of those occurrences or for any other absences from work. (McDaniels Dep. 166:1–25; Wood Decl. ¶ 36.)

As part of managing Ms. McDaniels' workers compensation claim, Group Health attempted to confirm that Ms. McDaniels could continue to perform her current job. (Wood Decl. ¶ 33.) To that end, Jennifer Adelfio, a risk management representative at Group Health, sent PA Green a description of the PAR job requirements along with an adjusted schedule that reflected the limitations from his evaluation. (Adelfio Decl. ¶¶ 2, 5, 6, Ex. A.) In response, PA Green confirmed that Ms. McDaniels could indeed work as a PAR with those limita-

tions. (*Id.* ¶ 6, Ex. A; Green Dep. at 20:21–21:17.)

Ms. Adelfio then sent a form letter to Ms. McDaniels to confirm that she would be continuing at her job but with the limitations specified by PA Green. (Adelfio Decl. ¶ 7, Ex. B.) Due to features of Group Health's automated workers compensation system, this form letter referred to a "temporary job offer."[1] (*Id.* ¶¶ 6–7, Ex. B.) Realizing that this language might give the wrong impression, Ms. Adelfio sent Ms. McDaniels and Ms. Wood an email in which she explained that Ms. McDaniels was staying in her current position. (*Id.* ¶ 7.) When Ms. McDaniels responded in a way that indicated that she nevertheless thought that she was being transferred, Ms. Adelfio sent several more emails reiterating that Ms. McDaniels' job was not changing and that the letter's language was just a formality. (*Id.*, Ex. C; Wood Decl. ¶ 34.) In any event, Group Health did not transfer Ms. McDaniels. (*See* Resp. at 3–4.)

**B. Discipline**

Ms. McDaniels' employment with Group Health was governed by Group Health's human resources policies and procedures, as well as a Collective Bargaining Agreement between Group Health and the Office and Professional Employees International Union Local No. 8, AFL–CIO ("the Union"). (Wood Decl. ¶ 5, Exs. B, C.) Early in her employment, Ms. McDaniels underwent mandatory training on Group Health's policies, including its Code of Conduct, Standards of Employee Conduct, attendance and absenteeism policy, and telephone and internet use policy. (*Id.* ¶ 9, Ex. C; McDaniels Dep. at 61:17–64:16.) As a result, she understood that honesty was an expectation and condition of her employment. (McDaniels Dep. at 75:4–79:3.) She also understood that dishonesty could lead to termination under Group Health's discretionary discipline policy. (*Id.* at 72:23–73:25, 78:10–79:3.)

Ms. McDaniels also received two trainings on Group Health's emergency response policies. (*Id.* at 64:17:65:14, 94:3–25; Wood Decl. ¶ 11, Ex. H.) Part of those policies is a system of codes that can be called out over the facility's intercom system to warn employees of different kinds of emergencies. (Wood Decl. ¶ 10, Ex. G.) One of those codes is a "code gray." (*Id.*) It signifies "crisis intervention/combative person" and alerts security of the need for "immediate manpower support to prevent harm to patients or others." (*Id.*) Manuals outlining these policies and codes are located throughout the Capitol Hill campus, including in the Unit. (*Id.*)

During her employment with Group Health, Ms. McDaniels incurred formal disciplinary action on five occasions. (*See id.* ¶ 12, Exs. I–M.) On March 9, 2011, she received a written warning for revealing confidential patient information. (*Id.*, Ex. I; McDaniels Dep. at 95:16–96:18.) That warning was removed from her file after three months pursuant to an agreement with the Union. (Wood Decl. ¶ 12; McDaniels Dep. at 97:16–23.) Then, on March 28, 2012, she received a second written warning, this time for using the phone and Internet for personal purposes during work hours. (Wood Decl. ¶ 12, Ex. J; McDaniels Dep. at 98:1–110:2.) She received a third written warning on July 17, 2012, for hostile conduct toward coworkers. (Wood Decl. ¶ 12, Ex. K; McDaniels Dep. at 110:14–120:16.) That

1. For the same reason, the correspondence between Ms. Adelfio and PA Green also used this language. (Adelfio Decl. ¶ 6, Ex. A.)

warning was labeled as "final"; however, on October 17, 2012, Group Health gave her a second final written warning for recording on her timesheet that she had worked during a period when she was in fact absent. (Wood Decl. ¶ 12, Exs. K, L; McDaniels Dep. at 110:14–111:19, 123:23–128:10.) In each of the latter three incidents, Ms. McDaniels' dishonesty regarding the incident aggravated the underlying misconduct. (Wood Decl. ¶ 12, Exs. J–L; McDaniels Dep. at 98:1–100:16, 118:16–120:1, 125:5–126:20.)

The fifth incident occurred on October 12, 2012, a week before Group Health terminated Ms. McDaniels' employment. (Wood Decl. Ex. M; McDaniels Dep. at 135:2–9.) On that day, Ms. McDaniels was working at a non-patient-facing workstation behind the short wall in the Unit. (Wood Decl. Ex. N; McDaniels Dep. at 143:20–24.) Around 3:00 p.m., Terrie Timmers, one of her co-workers who was working in front of the wall, informed Ms. McDaniels that a man wanted to see her. (Wood Decl. Ex. N; McDaniels Dep. at 143:20–24.) When Ms. McDaniels asked who it was, Ms. Timmers went back to check. (Wood Decl. Ex. N; McDaniels Dep. at 143:20–144:6.) She returned to tell Ms. McDaniels that the man was a process server waiting to serve papers on Ms. McDaniels. (Wood Decl. Ex. N; McDaniels Dep. at 144:7–9.)

At that time, Ms. McDaniels was involved in a dispute with her homeowners association regarding dues that Ms. McDaniels allegedly owed to the association. (McDaniels Dep. at 135:2–18.) Apparently, she had been served with papers at her home already and did not want to be served at work. (*Id.* at 142:14–143:1, 146:11–147:8; Wood Decl. Ex. N.) After conferring with Ms. McDaniels, Ms. Timmers told the process server that Ms. McDaniels was not there. (Wood Decl. Ex. N; McDaniels Dep. at 144:7–15.) The process server replied that he would wait. (Wood Decl. Ex. N; McDaniels Dep. at 144:12–16.) Ms. McDaniels overheard that remark and got up from her desk and left. (Wood Decl. Ex. N.)

Shortly thereafter, Ms. McDaniels called the operator at Group Health. (*Id.;* McDaniels Dep. at 144:17–145:1.) She told the operator that there was a man in the Unit who was harassing an employee. (McDaniels Dep. at 136:17–139:18; Wood Decl. ¶¶ 18–19.) When the operator asked if Ms. McDaniels was calling a code, she hesitated, possibly not understanding what a code was. (McDaniels Dep. at 137:16–138:12.) She then stated that security needed to come remove the man from the building. (*Id.* at 138:12–14.) The operator asked if this meant that she wanted a code gray. (*Id.* at 138:15–16.) Ms. McDaniels responded that she did, and the operator called a code gray throughout the facility. (*Id.* at 138:17–139:18; Wood Decl. ¶ 16, Exs. M, N.) When security arrived, they found no hostile or threatening persons. (Wood Decl. ¶ 17, Ex. O.) Eventually they ascertained that Ms. McDaniels had called regarding the process server, who had been sitting quietly in the waiting room. (*Id.* ¶¶ 17, 21, Exs. N, O.)

The code gray had a substantial disruptive effect. (*Id.* ¶ 25, Ex. M.) On that day, doctors in the Unit were performing abortions; and as such, a warning about a hostile person in the Unit was particularly disconcerting to staff members. (*Id.* ¶¶ 15, 21, 25, Exs. M, N.) Additionally, several security guards responded and spent approximately thirty minutes dealing with the incident. (*Id.* ¶¶ 16, 25, Exs. M, O.)

In the investigations that followed the code gray, Ms. McDaniels changed her version of events multiple times. Initially, she told the security guards that the process server had raised his voice to her.

(*Id.* ¶ 18, Exs. M, O; McDaniels Dep. at 147:9–20.) Later, in an investigatory meeting, she told Ms. Wood and several other Group Health officials that the security guards were lying about what she had said. (Wood Decl. ¶ 23, Ex. P.) At that point, she explained that she called the code gray simply to preempt a screaming episode between her and the process server. (*Id.*) Later in that meeting she changed her story yet again, claiming that she had overheard the process server threaten to search for her in the back room. (Wood Decl. ¶ 23.) Ms. McDaniels now admits that she never spoke to the process server or witnessed him being hostile or threatening to anyone. (McDaniels Dep. at 140:13–143:21, 145:10–148:21.)

As part of the investigation into the code gray episode, Ms. Wood also interviewed three other PA Rs and Ms. Timmers, all of whom were working nearby when the incident occurred. (Wood Decl. ¶ 21, Exs. N, O.) Their stories, along with the security guards' report, were all consistent with each other but inconsistent with the accounts of the incident that Ms. McDaniels had given thus far. (*See id.*) Two days after the investigatory meeting with Ms. McDaniels, Group Health mailed her a notice of termination. (*Id.* ¶¶ 23, 27, Ex. M.)

### C. The Dispute

In late July or early August of 2012, Ms. McDaniels filed joint charges with the Equal Opportunity Employment Commission ("EEOC") and the Washington State Human Rights Commission ("WSHRC") in which she alleged that Group Health discriminated against her on the basis of her race and disability. (Simon Decl. ¶ 7, Ex. 6.) On October 26, 2012, the WSHRC issued a no reasonable cause finding (*id.*), and the EEOC adopted that finding and issued a dismissal and notice of rights on January 16, 2013 (*id.*). However, on March 21, 2013, the WSHRC reopened the case (*id.*), and on April 15, 2013, the EEOC rescinded the dismissal and notice of rights (*id.*).[2] Shortly after she was terminated, Ms. McDaniels filed another charge with the EEOC, this time alleging discrimination on the basis of her race, disability, and age. (*Id.* ¶ 8, Ex. 7.) The EEOC issued a dismissal and notice of rights as to that charge on May 3, 2013 (*id.*), and Ms. McDaniels filed this suit on July 13, 2013 (*see generally* Ver. of State Court Rec.).

In her complaint, Ms. McDaniels asserts a variety of statutory and common law claims against Group Health. The thrust of those claims is that Group Health disciplined her unfairly because of her race and age; interfered with her rights to medical leave; and failed to provide her with a reasonable accommodation for her disability. (*See generally* Compl.; Resp.) She also nominally asserts claims for age discrimination, negligent supervision, breach of contract, and wrongful discharge. (*See generally* Compl; Resp.)

Group Health counters that it disciplined and eventually terminated Ms. McDaniels due to a pattern of policy violations and dishonesty that culminated in the incident involving the false code gray. (*See generally* Mot.; Reply.) Furthermore, Group Health contends that it reasonably accommodated Ms. McDaniels' disability and denied her medical leave

2. Because these administrative charges are apparently still pending, it appears that Ms. McDaniels may have failed to exhaust her administrative remedies with respect to several of her claims. Group Health has brought this issue to the court's attention (*see* Mot. at 24 n. 4), but devotes the relevant portions of its motion to attacking the substance of the apparently unexhausted claims. (*See generally* Mot.) Accordingly, the court will address the substance of all of Ms. McDaniels' claims.

requests in a way that was appropriate or at least non-prejudicial. (*See generally* Mot.; Reply.) Finally, Group Health argues that Ms. McDaniels' nominally asserted claims are entirely lacking in merit and factual basis. (*See generally* Mot.; Reply.)

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Galen v. Cnty. of L.A.,* 477 F.3d 652, 658 (9th Cir.2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets his or her burden, the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Galen,* 477 F.3d at 658. The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

Here, Ms. McDaniels has the burden of proof at trial on all of her claims; therefore, Group Health need not make an affirmative showing negating her case before summary judgment is appropriate. Instead, Group Health can show that there are no genuine issues of material fact simply by showing that there is no evidence to support Ms. McDaniels' various claims. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Furthermore, Rule 56(c) provides that a party asserting the presence or absence of a disputed fact must support that assertion by "citing to particular parts of materials in the record." Fed.R.Civ.P. 56(c)(1)(A). In addition, the court "need consider only the cited materials," Fed.R.Civ.P. 56(c)(3), and may take as "undisputed for purposes of the motion" any fact not properly contested or supported, Fed.R.Civ.P. 56(e)(2). These rules have particular relevance here because Ms. McDaniels has declined to include a fact section in her response brief and has provided almost no citations to specific parts of materials in the record. (*See generally* Resp.)

### B. Group Health Is Entitled to Judgment as a Matter of Law on All of Ms. McDaniels' Claims.

The court has struggled to interpret Ms. McDaniels' poorly articulated filings; however, the court has concluded that she is asserting seven types of claims: (1) race discrimination in violation of the Washington Law Against Discrimination ("WLAD") and Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) failure to accommodate her disability in violation of the Americans with Disabilities Act ("ADA") and the WLAD; (3) interference with her rights under the Family and Medical Leave Act ("FMLA"); (4) age discrimination in violation of the WLAD; (5) negligent supervision; (6) breach of contract; and (7) wrongful discharge. As set forth below, Ms. McDaniel has failed to create a genuine issue of material fact on any of these claims, and Group Health is entitled to judgment as a matter of law on all of them.

#### 1. *Race Discrimination under the WLAD and Title VII*

Ms. McDaniels appears to assert a disparate treatment claim and a hostile work

environment claim based on three instances of discipline, one of which resulted in termination. (*See* Compl. ¶¶ 8–10, 23; Resp. at 6.) She claims that Group Health disciplined her more harshly than it did similarly situated Caucasian employees and also that this uneven discipline created a hostile working environment. (Compl. ¶¶ 8–10, 23; Resp. at 6.) Neither of these claims can survive summary judgment, because Ms. McDaniels cannot make out a prima facie case for either of them.

*a. Disparate Treatment*

Courts generally use a burden shifting approach to evaluate Title VII disparate treatment claims at the summary judgment stage.[3] *Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1028 (9th Cir.2006) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). According to this approach, the plaintiff-employee has the initial burden to establish a prima facie case of discrimination. *Id.* If the plaintiff succeeds in making out a prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate non-discriminatory rationale ("LNR") for the challenged action. *Id.* Once the defendant comes forward with a LNR, the presumption of discrimination disappears and the burden shifts back to the plaintiff to demonstrate that the defendant's LNR is a mere pretext for discrimination. *Id.* At this final stage, the plaintiff must come forward with enough evidence for a reasonable jury to conclude by a preponderance of the evidence that "the defendant undertook the challenged employment action because of the plaintiff's race." *Id.*

To establish a prima facie case of disparate treatment, a plaintiff must show that (1) she is a member of a protected class; (2) she performed her job satisfactorily, was qualified, and met the legitimate expectations of her employer; (3) she suffered an adverse employment action; and (4) the defendant-employer treated her differently from a similarly situated employee who does not belong to the same protected class. *See id.* As an alternative to comparator evidence, the plaintiff can provide evidence of "other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination." *Peterson v. Hewlett–Packard Co.,* 358 F.3d 599, 603 (9th Cir.2004). Ms. McDaniels provides insufficient evidence to raise an inference of discrimination; therefore, her claim fails on the fourth prong of the prima facie case.

At least in the context of this motion, Ms. McDaniels meets the first three prongs of a prima facie case for disparate impact. She is African–American and a member of a protected class on the basis of her race. (*See* Compl. ¶ 8.) For the purposes of this motion, the court assumes without deciding that she was performing her job adequately.[4] Regarding the third

3. Washington courts use substantially the same framework when evaluating WLAD claims. *See Hill v. BCTI Income Fund–I,* 144 Wash.2d 172, 23 P.3d 440, 445–46 (2001) (en banc), *overruled on other grounds by McClarty v. Totem Elec.,* 157 Wash.2d 214, 137 P.3d 844 (2006).

4. Group Health argues that Ms. McDaniels was not performing her job adequately. (*See* Mot. at 22.) Indeed, it would seem strange to say that she was performing adequately when she admits to having violated Group Health policy. (*See, e.g.,* McDaniels Dep. at 147:9–20.) However, the thrust of Ms. McDaniels' claim seems to be that while she committed some misconduct, Group Health punished her more harshly for that conduct because of her race. (*See* Resp. at 6.) Given that claim, adequate job performance takes on a somewhat specialized meaning—it encompasses the misconduct that Ms. McDaniels committed. Under this interpretation of her argument, Ms. McDaniels performed just

prong, she cites three instances of disciplinary action as "adverse employment actions."[5] These three incidents are (1) her March 2011 written warning for violating patient confidentiality; (2) her March 2012 written warning for violating the phone and internet use policy and for dishonesty during the investigation; and (3) her October 2012 termination for causing a code gray to issue under false pretenses and for dishonesty during the investigation. (*See* Resp. at 6; McDaniels Dep. at 226:2–14; *supra* § I.B.) She seems to argue that on these three occasions Group Health disciplined her, or at least disciplined her more harshly, because she is African–American. (*See* Resp. at 6.) Her prima facie case cannot succeed, however, because she has failed to create a genuine issue of fact that Group Health treated her differently because of her race.

To raise an inference of discrimination, the plaintiff must be able to point to either (a) one or more valid comparators, or (b) other circumstances surrounding the adverse action that create an inference of discrimination. *See Peterson,* 358 F.3d at 603. Valid comparators must be similar to the plaintiff "in all material respects." *Moran v. Selig,* 447 F.3d 748, 755 (9th Cir.2006) (citing *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53–54 (2d Cir.2001)). Although material characteristics vary from case to case, in termination and discipline cases, the Ninth Circuit looks to factors such as whether the proposed comparator and the plaintiff were subject to the same policies, worked at the same jobs, committed similar violations, and had similar disciplinary records. *See, e.g., Vasquez v. Cnty. of L.A.,* 349 F.3d 634, 641 (9th Cir.2003) (similar jobs and similar type and severity of misconduct); *Wall v. Nat'l R.R. Passenger Corp.,* 718 F.2d 906, 909 (9th Cir.1983) (similar conduct and disciplinary records); *see also Collins v. Potter,* 431 Fed.Appx. 599, 600 (9th Cir.2011) (finding proposed comparator insufficiently similar because she was not subject to a "Last Chance Employment Agreement" and had no record of dishonesty or insubordination).

Ms. McDaniels attempts to raise an inference of discrimination using comparators—that is, by pointing to instances where Caucasian employees allegedly received lesser punishments for similar violations of Group Health policy. (*See* Compl. ¶ 9; Resp. at 6.) In particular, she points to (1) Norma Schlegel, a white PAR who inappropriately disclosed patient information and received a verbal warning[6] and a recommendation for further training;[7] (2) Eric Madsen, a white employee who violated Group Health's internet use policy and received a verbal warning with an accompanying written record of the warning;[8]

as adequately as her Caucasian colleagues who engaged in similar conduct; and the discrimination lies in the fact that she was written up and then fired for that conduct while they were not. Having interpreted her claim in this way, the court finds it more useful to focus the analysis on whether Ms. McDaniels has met prong four.

5. The court acknowledges that Group Health disputes whether all of these incidents qualify as adverse employment actions. (*See* Mot. at 22 n. 1.) For the purposes of this order, the court assumes without deciding that Ms. McDaniels was subject to an adverse employment action on these three occasions.

6. This is the parties' term. The court interprets "verbal" in this context as meaning spoken rather than written.

7. Ms. McDaniels received a written warning for disclosing patient information. That warning was removed from her file pursuant to a union settlement. (*See* Wood Decl. ¶ 12; McDaniels Dep. at 97:16–23.)

8. Ms. McDaniels received a written warning for violating Group Health's phone and inter-

and (3) an email suggesting that another employee might have initiated a false code gray on a different occasion.[9] (*See* Resp. at 6.)

■ The problem with each of these proposed comparators, however, is that they are not similar to Ms. McDaniels in all material respects. *See Moran,* 447 F.3d at 755. Ms. Schlegel's disclosure of patient information occurred under circumstances that mitigated its seriousness—she disclosed a patient's middle initial to a uniformed police officer while trying to assist an investigation, and after she realized her mistake, she came in immediately on her day off to self-report. (*See* Wood Decl. $ 39, Ex. AA.) Ms. McDaniel's violation came to light only when her supervisor received notice of a security breach.[10] (*See id.* $ 39); *Vasquez,* 349 F.3d at 641. Moreover, Ms. Schlegel worked in a different department and for a different supervisor. (*See* McDaniels Dep. at 229:13–230:18.) Mr. Madsen is distinct from Ms. McDaniels in two material respects. Unlike Ms. McDaniels, he violated only the internet policy, not the phone policy as well, and he did not lie during the investigation of his misconduct. (*See* Simon Decl. ¶ 9, Ex. 8; Mot. at 22–23); *Vasquez,* 349 F.3d at 641; *Collins,* 431 Fed.Appx. at 600. Ms. McDaniels has not disputed any of these distinctions. Accordingly, neither of these proposed comparators is sufficiently similar to Ms. McDaniels.

Ms. McDaniels' third proposed comparator fares even worse. Ms. McDaniels claims that "another Group Health employee, who was white, called a false code gray and she received no discipline." (Resp. at 6.) As evidence of this she produces a single email, addressed to multiple addressees, which reads, "A code gray was called today, and apparently it became obvious that we ALL need to aware of what this means. Please DO NOT call the operator to ask what this means." (McDaniels Decl. Ex. D.) Although this email suggests that an unwarranted code gray may have occurred, the email fails to disclose numerous facts necessary to determining whether a valid comparator exists. For instance, the email says nothing about who initiated the code gray, what that person's race is, whether that person was mistaken or intended to mislead, whether that person lied in the subsequent investigation, and what kind of disciplinary record that person had at the time. (*Cf.* Wood Decl. ¶¶ 22–27, Ex. M (explaining Group Health's asserted reasons for firing Ms. McDaniels).) It also does not show that the responsible party "received no discipline," as Ms. McDaniels claims. (*See* Resp. at 6.) As such, Ms. McDaniels has failed to create a genuine issue of fact with respect to the existence of valid comparators.

■ Moreover, Ms. McDaniels fails to provide evidence of "other circumstances" surrounding her adverse employment actions that might raise an inference of discrimination. *See Peterson,* 358 F.3d at 603. In her response motion, she asserts that the code gray was warranted. (Resp. at 6.) Yet she provides no evidence to support that assertion, and her own depo-

net policy and then lying about it. (*See* Wood Decl. ¶ 12.)

9. Group Health fired Ms. McDaniels after her code gray incident. (*See* Wood Decl. ¶ 12.)

10. As mentioned above, the documents pertaining to this incident were removed from Ms. McDaniels' personnel file. Ms. McDaniels has not provided the court with any of those documents or explained the circumstances surrounding her disclosure of patient information. Consequently, the court is unaware of any facts that might render Ms. McDaniels' situation more comparable to Ms. Schlegel's.

sition testimony contradicts it (*see* McDaniels Dep. at 144:17–145:9, 147:9–149:4), as does considerable evidence from Group Health's internal investigation (*see* Wood Decl. ¶¶ 13–24, Exs. N–P). Furthermore, Ms. McDaniels does not dispute that she was dishonest during the code gray episode, (*see* McDaniels Dep. at 147:9–148:21), or that her dishonesty played a significant role in the decision to terminate her (*see* Wood Decl. ¶¶ 26–27, Ex. M). In view of her inability to raise an inference of discrimination, she cannot make out a prima facie case of disparate treatment on the basis of her race.

■ Furthermore, even if the court overlooked the deficiencies in Ms. McDaniels' prima facie case, Ms. McDaniels' disparate treatment claim would still fail. Group Health has offered a compelling LNR—namely, that it disciplined and ultimately terminated Ms. McDaniels due to a documented pattern of policy violations and dishonesty. (*See, e.g.,* Mot. at 23; Wood Decl. ¶¶ 26–27, Ex. M.) That would shift the burden back to Ms. McDaniels to provide "specific and substantial evidence" of discrimination. *See Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir.1996). Conclusory allegations, speculation, and unsupported assertions would be insufficient. *Rivera v. Nat'l R.R. Passenger Corp.,* 331 F.3d 1074, 1078 (9th Cir.2003); *Nelson v. Pima Cmty. Coll.,* 83 F.3d 1075, 1082–83 (9th Cir.1996).

However, Ms. McDaniels' only argument linking Group Health's conduct to her race is the same insufficient comparator evidence, her unsupported assertion that the code gray was warranted, and her "gut feeling" that race played a role. (*See* Resp. at 6; McDaniels Dep. at 231:9–19.) Group Health, on the other hand, has amassed in support of its LNR considerable evidence of Ms. McDaniels' misconduct (*see, e.g.,* Mot. at 23; Wood Decl. ¶¶ 12–24, Exs. J–O), almost none of which Ms. McDaniels disputes. Even drawing all inferences in favor of Ms. McDaniels, no reasonable jury could conclude by a preponderance of the evidence that race motivated Group Health's decisions to discipline and eventually terminate her. Therefore, Group Health is entitled to summary judgment on Ms. McDaniels' disparate treatment race discrimination claim.

*b. Hostile Work Environment*

■ To state a claim for hostile work environment on the basis of race, a plaintiff must show that (1) she was subjected to verbal or physical conduct directed at her because of her race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *See Manatt v. Bank of Am.,* 339 F.3d 792, 798 (9th Cir.2003).

Ms. McDaniels cannot meet even the first prong of a prima facie case of hostile work environment. The entirety of Ms. McDaniels' submissions regarding this claim consists of two conclusory statements in her complaint.[11] These statements seem to link the alleged hostile environment to the same instances of discipline that form the basis of her disparate treatment claim. However, as dis-

11. Those statements are as follows: (1) Group Health supervisors and employees conspired to "discipline Ms. McDaniels in a way that violated Group Health's disciplinary policies and subjected Ms. McDaniels to a hostile work environment ... due to Ms. McDaniels['] race...." (2) "Defendants have intentionally ... discriminated against the plaintiff on account of her race ... by creating and maintaining a racially pervasive and discriminatory work environment which perpetuated the discriminatory treatment of the plaintiff...." (Compl. ¶¶ 10, 23.)

cussed above with reference to her disparate treatment claim, Ms. McDaniels has failed to create a genuine issue of material fact regarding whether Group Health disciplined her because of her race. That failure also defeats a hostile work environment claim premised on the same instances of discipline.

2. *Failure to Accommodate Disability Discrimination under the ADA and the WLAD*

Ms. McDaniels claims that Group Health violated the ADA and the WLAD by refusing to reasonably accommodate her disabilities. (Compl. ¶ 7; Resp. at 3–4.) She admits that Group Health did not fire her because of her disabilities (*see* McDaniels Dep. at 222:23–223:4), and that Group Health made some accommodations, such as removing cords from under her desk, allowing her to designate one chair in a shared workspace as her own, and permitting her to stand up from her desk and walk around for five minutes of every hour (*see Resp.* at 3; *see also* Adelfio Decl. ¶ 4; Wood Decl. ¶¶ 28, 29, 33). Nevertheless, she asserts that Group Health could have done more and therefore failed to reasonably accommodate her. (*See* Resp. at 3–4.) Ms. McDaniels' accommodation claim cannot survive summary judgment under either the ADA or the WLAD.

Judicial interpretations of the ADA and the WLAD differ slightly in the way they phrase the elements of an accommodation claim under the two statutes, but the basic requirements are essentially the same. Both statutes require the plaintiff to show that (1) she is disabled; (2) she is qualified for the job in question and capable of performing it with reasonable accommodation; (3) the employer had notice of her disability; and (4) the employer failed to reasonably accommodate her disability. *See Samper v. Providence St. Vincent Med. Cntr.,* 675 F.3d 1233, 1237 (9th Cir.2012); *Zivkovic v. S. Cal. Edison Co.,* 302 F.3d 1080, 1088–89 (9th Cir.2002); *Davis v. Microsoft Corp.,* 149 Wash.2d 521, 70 P.3d 126, 131 (2003). Group Health concedes for purposes of this motion that Ms. McDaniels is disabled under the WLAD and the ADA (*see* Mot. at 27 n. 7), and the parties do not dispute prongs two and three. Rather, Group Health contends, and the court agrees, that Ms. McDaniels fails to create a genuine issue of material fact with respect to prong four.

Neither the ADA nor the WLAD requires an employer "to offer the employee the precise accommodation he or she requests." *Doe v. Boeing Co.,* 121 Wash.2d 8, 846 P.2d 531, 538 (1993); *Zivkovic,* 302 F.3d at 1089. The employer need only provide enough accommodation to enable the employee to perform the essential functions of his job. *See Dark v. Curry Cnty.,* 451 F.3d 1078, 1089 (9th Cir. 2006); *Doe,* 846 P.2d at 537. To prevail on an accommodation claim, the plaintiff-employee must have requested an accommodation, unless the need for one was obvious, *see Zivkovic,* 302 F.3d at 1089, and must "show[ ] the reasonableness of an accommodation," *see Giebeler v. M & B Assocs.,* 343 F.3d 1143, 1156 (9th Cir.2003) (citing *U.S. Airways v. Barnett,* 535 U.S. 391, 401–02, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002)). Moreover, the plaintiff must make some showing that she required an accommodation to perform the essential functions of her job on equal terms with nondisabled employees. *See Jura v. Cnty. of Maui,* No. 11–00338 SOM/RL P, 2012 WL 5187845, at *9–10 (D.Haw. Oct. 17, 2012), *aff'd* 582 Fed.Appx. 742 (9th Cir. 2014); *see also Riehl v. Foodmaker, Inc.,* 152 Wash.2d 138, 94 P.3d 930, 934–35 (2004) (explaining that WLAD plaintiffs must prove the accommodation is medically necessary).

Ms. McDaniels devotes her briefing to arguing that Group Health could have transferred her to another job but inexplicably withdrew its transfer offer. (*See* Resp. at 3–4.) She claims that this shows Group Health's failure to reasonably accommodate her disabilities. (*Id.* at 4.) Yet the undisputed facts reveal that Group Health did not offer to transfer Ms. McDaniels.[12] (Adelfio Decl. ¶ 7, Ex. C; Wood Decl. ¶ 34.) Furthermore, Ms. McDaniels cites to no evidence that she even requested a transfer. Nor does she make any showing that Group Health's existing accommodations were inadequate or that a transfer—or any other additional accommodation—would've been reasonable. Group Health, on the other hand, offers substantial undisputed evidence of its efforts to accommodate Ms. McDaniels' disabilities. (*See generally* Mot. at 27–28; *see also supra* § I.A.) Consequently, Ms. McDaniels has not created a genuine issue of material fact regarding whether Group Health failed to reasonably accommodate her disabilities. The court therefore grants summary judgment in Group Health's favor on Ms. McDaniels' accommodation claim.

3. *FMLA Interference*

Ms. McDaniels claims that Group Health interfered[13] with her rights under the FMLA by denying her leave to which she was entitled in two sets of circumstances.[14] First, she asserts that Group Health refused on several occasions to give her time off for medical appointments. (*See* Compl. ¶¶ 25–28; McDaniels Decl. Ex. H.) Second, she contends that Group Health twice wrongfully failed to count medical appointments as FMLA leave. (*See* Compl. ¶¶ 25–28; McDaniels Dep. at 278:10–279:8.) Ms. McDaniels' FMLA claim cannot survive summary judgment on either basis.

12. In support of her position, Ms. McDaniels points to a letter she received from Ms. Adelfio on July 25, 2012, and the correspondence between Ms. Adelfio and PA Green. (Adelfio Decl. Exs. A, B.) Group Health argues that these documents do not demonstrate that it offered her a transfer. (Resp. at 28 n. 8; Reply at 12–13.) To support its position, Group Health cites a string of explanatory emails that accompanied the letter. (Adelfio Decl. ¶ 7, Ex. C.) Those emails explained to Ms. McDaniels that Group Health was not offering her a new job and that the "job offer" language was just a formality. (*Id.*) Ms. McDaniels does not dispute any of that evidence or explain how it fails to show that Group Health did not offer her another position. Thus, the court concludes that Ms. McDaniels fails to raise a genuine issue of material fact on this point.

13. In her complaint, Ms. McDaniels characterizes her FMLA claim as one for both interference and retaliation. She describes the retaliation aspect of her claim as follows: "Group Health also retaliated against Ms. McDaniels when she attempted to exercise ... her FMLA rights by counting FMLA leave against the firm's absentee policy for disciplinary purposes and by disciplining the Plaintiff for using her approved FMLA." (Compl. ¶ 12.) Later, in her response motion, Ms. McDaniels seems to recast her FMLA claim as one for interference only, apparently realizing that the type of conduct she describes in her complaint qualifies as FMLA interference, not retaliation, under Ninth Circuit law. *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1135–36 (9th Cir.2003); (Resp. at 7–8). The court, therefore, will treat Ms. McDaniels' FMLA claim as one for interference only.

14. In her complaint, Ms. McDaniels also alleges that Group Health disciplined her for taking FMLA leave (Compl. ¶ 12); however, as Group Health points out, she has failed to provide any factual support or further argument on this point (Mot. at 26). As such, the court finds there is no genuine dispute of material fact regarding this part of Ms. McDaniels' FMLA claim. The following discussion, therefore, will deal only with Ms. McDaniels' claim that Group improperly denied her FMLA leave.

■ To prevail on a FMLA interference claim, an employee must establish that "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Sanders v. City of Newport,* 657 F.3d 772, 778 (9th Cir.2011) (internal quotation marks omitted). The parties do not contest elements one through three; however, they disagree about elements four and five.

■ When evaluating the final two elements of the above test, the court must bear in mind that Congress intended the FMLA to serve as an accommodation of the needs of both employees and their employers. *See* 29 U.S.C. § 2601(b) (reciting the purposes of the FMLA). In furtherance of that goal, the FMLA gives employees significant rights but also imposes on them some obligations designed to accommodate the legitimate business concerns of employers. Thus, if an employee's need for leave is foreseeable based on planned medical treatment, the employee must provide notice to the employer and "make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer." 29 U.S.C. § 2612(e)(2) (this requirement is subject to the approval of the employee's healthcare provider); *see also* 29 C.F.R. §§ 825.117, 302 (accord) (Department of Labor Regulations for the FMLA).[15] Furthermore, in order for an employee to obtain relief under the FMLA, the asserted violation must result in prejudice to the employee. *See Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 89, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002).

■ Insofar as her FMLA claim depends on Group Health's refusal to approve certain leave requests, Ms. McDaniels has failed to create a genuine issue of material fact about whether she made reasonable efforts to accommodate Group Health's legitimate operational needs. Ms. McDaniels does not contest that Group Health granted the vast majority of her requests for leave.[16] In fact, she has specifically identified only two instances when Group Health refused her leave requests.[17] (*See* McDaniels Decl. Ex. H.) Group Health contends that on these occasions it requested that Ms. McDaniels reschedule her appointments because the Unit was already going to be understaffed at the time she requested. (*See* Wood Decl. ¶ 38; *see also* McDaniels Decl. Ex. H.) Ms. McDaniels has produced no evidence to show that this operational concern was unjustified or unreasonable. Nor has she provided any evidence to show that rescheduling those appointments was unreasonably burdensome or contrary to the advice or recommendations of her healthcare provider. Consequently, Ms. McDaniels' FMLA claims cannot survive on the basis of these two instances.

■ Ms. McDaniels also cannot rely on Group Health's failure to count two absences as FMLA leave. In both cases, Group Health's leave administrator, Ma-

15. Congress authorized the Department of Labor to issue implementing regulations for the FMLA. *See* 29 U.S.C. § 2654. "These regulations are entitled to deference under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Xin Liu,* 347 F.3d at 1133.

16. From March through October, Group Health approved more than 220 hours of intermittent FMLA leave for Ms. McDaniels. (*See* Wood Decl. ¶¶ 30, 36, 37, Ex. Y; Simon Decl. ¶ 10 (table of leave hours and dates).)

17. One was for four hours; the other was for eight hours. (*See* Wood Decl. ¶ 37.)

trix, designated the absence as non-FMLA after Ms. McDaniels had already taken the time off. (McDaniels Dep. at 277:13–280:17; Wood Decl. ¶ 37.) Group Health contends that those absences entailed no adverse consequences for Ms. McDaniels (*see* Mot. at 26), and Ms. McDaniels offers no evidence to show that she suffered any harm as a result of Group Health's alleged error. In fact, she admitted in her deposition that Group Health never disciplined her for absenteeism. (*See* McDaniels Dep. at 166:1–25, 290:19–292:3.) Thus, even if Group Health should have counted these absences as FMLA leave, Ms. McDaniels suffered no prejudice as a result of Group Health's mistake. *See Ragsdale,* 535 U.S. at 89, 122 S.Ct. 1155. Accordingly, Group Health is entitled to summary judgment on Ms. McDaniels' FMLA interference claim.

4. *Age Discrimination under the WLAD*

Ms. McDaniels' age discrimination claim appears in her submissions to this court only in headings. In her complaint, she labels her third cause of action "DISCRIMINATION ON THE BASIS OF RACE, DISABILITY AND AGE...." (Compl. heading VII.) Group Health responds in the instant motion by arguing, with citations to evidence in the record, that Ms. McDaniels cannot show that Group Health subjected her to any adverse employment action on the basis of her age. (Mot. at 21.) In her response brief, Ms. McDaniels does not address Group Health's arguments. Instead, she simply includes another heading: "Under Title VII, WLAD age and Prima Facie Case." (Resp. at 4.) Accordingly, the court finds there is no genuine issue of material fact and Group Health is entitled to summary judgment on Ms. McDaniels' age discrimination claim.

5. *Negligent Supervision*

To prevail on a claim of negligent supervision in Washington, a plaintiff must show that (1) an employee of the defendant acted outside the scope of her employment, (2) the employee presented a risk of harm to others, (3) the employer knew or should have known in the exercise of reasonable care that the employee posed a risk to others, and (4) the employer's failure to supervise the employee was the proximate cause of the plaintiff's harm. *Briggs v. Nova Servs.,* 135 Wash.App. 955, 147 P.3d 616, 622 (2006) (citing *Niece v. Elmview Group Home,* 131 Wash.2d 39, 929 P.2d 420 (1997)). Ms. McDaniels appears to base her negligent supervision claim on the theory that Group Health failed to adequately train Ms. Wood, and as a result Ms. Wood disciplined Ms. McDaniels in an allegedly discriminatory manner. (*See* Compl. ¶ 16; Resp. at 9.) As Group Health points out, however, Ms. McDaniels has neither alleged nor provided any evidence that Ms. Wood acted outside the scope of her employment when she disciplined Ms. McDaniels. (*See* Mot. at 29; Reply at 14.) Moreover, the court has already found that Ms. McDaniels has not created a genuine issue of material fact regarding racially discriminatory treatment by Group Health and Ms. Wood. As such, Group Health is entitled to summary judgment on Ms. McDaniels' negligent supervision claim.

6. *Breach of Contract*

Ms. McDaniels addresses this claim only once, with a single sentence. In her complaint, she states that she "had an actual or implied employment contract with the Defendants, and the Defendants[ ] unlawfully breached their employment contract with the plaintiff, and wrongfully terminated her." (Compl. ¶ 20.) Group Health argues that this claim should be dismissed for failure to satisfy the pleading standards laid out in *Ashcroft v. Iqbal,* 556 U.S.

662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), because it amounts to a mere recital of the elements of a cause of action. *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

Ms. McDaniels has not responded to Group Health's argument. Moreover, the deadline for amending pleadings has passed, and allowing amendment now, only one month before the trial date, would significantly prejudice Group Health. (*See* Minute Order Setting Trial Dates and Related Dates (Dkt. # 12) at 1 (setting deadline for amended pleadings at June 4, 2014, and trial date at December 1, 2014); *see also* Fed.R.Civ.P. 15(a)(2).) Furthermore, Ms. McDaniels admits that she had no employment contract with Group Health (McDaniels Dep. at 301:13–303:21), and Washington adheres to the "at-will" doctrine of employment law, *Ford v. Trendwest Resorts, Inc.,* 146 Wash.2d 146, 43 P.3d 1223, 1226 (2002). Consequently, the court grants summary judgment in Group Health's favor on Ms. McDaniels' breach of contract claim.

7. *Wrongful Discharge*

Washington law recognizes a narrow cause of action for wrongful discharge where the discharge violates a clear mandate of public policy. *See Reninger v. State Dep't of Corrs.,* 134 Wash.2d 437, 951 P.2d 782, 787 (1998). To establish such a claim, a plaintiff must show (1) a clear public policy, (2) that discouraging the plaintiff's conduct would jeopardize the public policy, and (3) that the plaintiff's public-policy-linked conduct caused the dismissal. In addition, (4) the defendant must not be able to offer an overriding justification for the dismissal. *Korslund v. DynCorp Tri–Cities Servs., Inc.,* 156 Wash.2d 168, 125 P.3d 119, 125 (2005). Ms. McDaniels' wrongful discharge claim is hardly a model of clarity; however, she appears to assert the following: (a) that the FMLA, the ADA, and the WLAD evince a clear public policy in favor of medical leave and the accommodation of disabilities; (b) that she was fired for seeking leave and an accommodation; and (c) that allowing her termination to go unpunished would jeopardize the public policy behind the FMLA, the ADA, and the WLAD. (*See* Resp. at 10.)

Even under that generous interpretation of her submissions to this court, Ms. McDaniels' wrongful discharge claim fails. The court has already found that Ms. McDaniels has not created a genuine issue of material fact regarding whether she was fired for taking FMLA leave or seeking an accommodation for her disabilities. That finding destroys an essential element of her wrongful discharge claim, and she presents no new evidence in the context of this claim to warrant altering that finding. Therefore, Group Health is entitled to summary judgment on Ms. McDaniels' wrongful discharge claim.[18]

## III. CONCLUSION

For the foregoing reasons, the court GRANTS Defendant Group Health's motion for summary judgment (Dkt. # 13) and enters summary judgment in favor of Group Health on all claims before the court. The court DENIES as moot the pending motions in limine (Dkt. ## 22, 23, 25).

18. Group Health asserts that this claim should be dismissed for several additional reasons. (*See* Reply at 15–16.) The court expresses no opinion on the merits of those arguments because it finds Ms. McDaniels' failure on the causation element sufficient to dispose of this claim.